Filed 08/12/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>ANTONINO FLORES,<br><br>    Defendant and Appellant. | G055861<br><br>(Super. Ct. No. 15WF2590)<br><br>O P I N I O N |

          Appeal from a judgment of the Superior Court of Orange County, Robert R. Fitzgerald, Judge (retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) and David A. Hoffer, Judge. Reversed and remanded with directions.

          Patrick Dudley, under appointment by the Court of Appeal, for Defendant and Appellant.

          Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Yvette M. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

Following the partial denial of his motion to suppress evidence pursuant to Penal Code section 1538.5, defendant Antonino Flores pleaded guilty to one count of possession for sale of methamphetamine (Health & Saf. Code, § 11378). The court suspended imposition of sentence and granted defendant probation under various terms and conditions.

Defendant's sole contention on appeal is the court erred by not granting his motion to suppress in its entirety. We agree and reverse the judgment and remand with directions.

## FACTS AND PROCEDURAL HISTORY

*Evidence Presented*

One October day, a seven-member team of Huntington Beach police officers went to an alleyway in a residential area claimed by the "Looney Tunes Crew," also known as the "LTK" street gang. LTK "usually me[t]" and "congregate[d]" in this alley. Police went there as part of a "continuing . . . investigation" into LTK, to "identify[] and contact[]" individuals regarding recent criminal activity, and to ascertain possible gang membership or association of those in the area. There had been multiple complaints regarding gang activity in the area, including "several shootings . . . over the past several months," and "drug sales . . . in the alley."[1] There were no reports of a specific crime or of gang activity this day and time.

Officers drove to the area in unmarked cars, although they wore clearly marked police raid vests or jackets. They "came up with a plan to approach [the members of LTK] on both sides because we knew as soon as they see police cars they run." The team approached on foot from opposite ends with a goal to "hopefully detain them before they run."

---

[1] Most of these prior complaints came "over the weekend, at night." Defendant's encounter with police in this matter occurred on a Thursday at about 1:00 p.m.

2

Stationed adjacent to one end of the alley, Sergeant Oscar Garcia saw "people . . . running from the alley" toward him and Detective Daniel Quidort. Among them, Garcia recognized defendant from "prior contacts dealing with the LTK gang," and suspected he "might be involved in criminal activity, past, present, or taking place at that time." Such activity could be "[e]ither gang activity or drug sales because of the complaints we had received" "within days, weeks, months."

On cross-examination, Garcia explained defendant was singled out because "we focused on [him] as he was coming towards us and we were already detaining him." He was also "the closest one we could get." Garcia's suspicion defendant was involved in their current investigation was also based on "[t]he fact that he ran from an area where we know there's criminal activity taking place." There was no evidence of criminal activity then taking place.

Quidort testified he saw defendant "making his way rather quickly" through a residential walkway between the alley and where he and Garcia were located. Quidort made eye contact, and defendant slowed to a "brisk walk," and then to a "quick pace." When defendant was about five to ten feet from the officers, Quidort made contact. Quidort told defendant to sit down on a step next to the sidewalk, and he immediately complied without incident.[2] At this point, Quidort did not know who defendant was or anything about him, including any LTK connection. Only after defendant was seated did Garcia tell Quidort who defendant was and that he believed defendant was a member of LTK.

Garcia acknowledged that when Quidort seated defendant on the step, he was not "a suspect in a particular crime," and was not "in the process of committing some crime." Similarly, Garcia had no information defendant had committed a crime "in the

---

[2] Garcia testified Quidort "asked" defendant to sit on the step. Quidort recalled he had "told" defendant to sit down. The trial court found it made no difference in these circumstances. We agree.

3

recent past [Garcia] wanted to investigate him for," or "about a crime [Garcia] believed he was about to commit."

There is no evidence defendant was patted down for weapons. He was not handcuffed or placed under arrest, and neither Garcia nor Quidort had his weapon drawn.

Garcia left the scene to check on officers who were detaining other individuals nearby, momentarily leaving defendant with Quidort. While engaging in "some small talk" with defendant, Quidort noticed a bulge in defendant's sock. Quidort radioed Garcia and asked him to come back. When Garcia returned, Quidort asked defendant what he had in his sock. Defendant said it was "meth." Quidort asked defendant to remove it from his sock, and he complied, handing the package over to Quidort. Quidort recognized the package, which contained four bindles of approximately equal weight, as methamphetamine packaged for sale.

Garcia knew defendant shared an apartment with a brother, an LTK member who was on probation for narcotics sales and subject to warrantless searches and seizures. Garcia asked defendant if he had anything illegal at home. Defendant did not answer, but he agreed to go back to the apartment. He did not consent to have it searched. Defendant said he did not want anyone else to get into trouble and did not want his parents to find out about the drugs he had given to Quidort. Defendant, Garcia, and Quidort then walked to defendant's nearby apartment. Again, defendant was not handcuffed and was not under formal arrest during this short walk.

Garcia knocked on the door, and once he confirmed the probationer brother was at home, the officers entered. Defendant did not give consent either to the entry or to any subsequent search inside.

Detective John Topartzer soon joined the group at the apartment and, at Garcia's request, defendant directed the officers to his bedroom, which he shared with a different, nonprobationer, brother. Garcia asked defendant if he had anything illegal in his room, and defendant responded by again saying that he did not want to get anyone in

4

trouble. Defendant then walked over to a dresser drawer and pulled out a shirt containing four small baggies of suspected methamphetamine.

Topartzer arrested defendant for possession of a controlled substance with the intent to sell. He was transported to jail, where Topartzer informed him of his *Miranda*[3] rights. Defendant admitted to Topartzer that he was selling methamphetamine in order to make money, and stated the methamphetamine "he had on him" was for sale.

*The Trial Court's Ruling*

The court found the initial contact between defendant, Garcia, and Quidort was a detention, but was supported by reasonable suspicion. Recognizing that flight alone cannot support a lawful detention, the court found additional supporting facts were present, including the previous citizen complaints regarding crime in the alley— specifically drug sales, assaults, and "gang-related activity." The court also found defendant had engaged in "headlong flight" from the group of people congregating in the alley as soon as police arrived. "[W]hen you put all of that together there was articulable suspicion to detain [defendant] and to see if he either had drugs on him or some kind of a weapon that can be used in an assault." "[T]his . . . is different than a situation where this person is alone. He's with that group that they expect to find in that alley. That's the gang hangout. That's where they've gotten the complaints, and then he bolts. I think when you put all of that together it . . . does constitute articulable suspicion to stop him." Relying on *Illinois v. Wardlow* (2000) 528 U.S. 119 (*Wardlow*), the court found defendant's unprovoked headlong flight from a high crime area upon seeing police provided legal cause for an investigatory detention. Based on this finding, the court concluded the drugs in defendant's sock and any curbside statements should not be suppressed.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

The court granted the suppression motion with respect to the evidence seized at defendant's apartment, ruling that the prosecution failed to prove express or implied consent to either enter defendant's room or to search it. It concluded the search could not be justified as a probation search because defendant did not share his room with his probationer brother. The People do not contest this ruling on appeal.

Subsequently, the court received additional briefing and testimony regarding the admissibility of defendant's jailhouse statements to Topartzer. The court considered whether the statements had been obtained by an exploitation of the illegality of the residential search or instead by means sufficiently distinguishable to be purged of the primary taint of that search. The court determined "[t]he same questions would have been asked if [defendant] had simply been arrested after the drugs were found in his sock." It also noted detectives did not confront defendant with the illegally seized evidence, opining "this might be different if at the interview room . . . all eight baggies were lined up and then [defendant] was asked the same question. Here there's a break . . . . He is present to see that the other baggies are found, and then he's taken to the police station and Mirandized and makes his statement." The court declined to suppress the jailhouse statements, ruling that the illegal search of the residence did not induce defendant's later admissions at the jail.

**DISCUSSION**

*1. Standard of Review*

Defendant, as the moving party, had the initial burden of proving a warrantless search or seizure occurred. (*People v. Williams* (1999) 20 Cal.4th 119, 127-128, 136.) There was no warrant in this case, so the burden shifted to the prosecution to show any warrantless searches or seizures were justified under the Fourth Amendment to the United States Constitution. (*Id.* at pp. 130, 136-137.) "[T]he controlling burden of proof at suppression hearings . . . [is] proof by a preponderance of the evidence." (*United States v. Matlock* (1974) 415 U.S. 164, 177, fn. 14.)

6

"As the finder of fact in a proceeding to suppress evidence [citation], the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable." (*People v. Woods* (1999) 21 Cal.4th 668, 673.) "In reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's factual findings, express or implied, where supported by substantial evidence. [Citation.] And in determining whether, on the facts so found, the search was reasonable for purposes of the Fourth Amendment to the United States Constitution, we exercise our independent judgment. [Citation.]" (*People v. Simon* (2016) 1 Cal.5th 98, 120; *Woods,* at p. 673.) We consider whether a search or seizure was reasonable under an objective standard, based on the facts and circumstances known to the officer but without regard to the officer's subjective state of mind. (*Scott v. United States* (1978) 436 U.S. 128, 138.)

*2. Defendant's Initial Detention Was Not Supported by a Reasonable Suspicion of Criminal Activity.*

*a. Background*

A person is seized within the meaning of the Fourth Amendment when an officer, using a show of authority or physical force, intentionally restrains the person's freedom to move. (*Brendlin v. California* (2007) 551 U.S. 249, 254.) Even if "an individual's submission to a show of governmental authority takes the form of passive acquiescence . . . a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave'" (*Id.* at p. 255.)

An investigative detention is legally justified "when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231 (*Souza*).)

7

The People concede defendant was detained when Quidort had him sit down near the curb.  We therefore turn to the question whether defendant's curbside detention was supported by sufficient suspicion of criminal activity.  Defendant argues it was not.  We agree.

### b. Analysis

In *United States v. Cortez* (1981) 449 U.S. 411, the court stressed the importance of taking into account "the totality of the circumstances" in determining the propriety of a temporary detention:  "Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person.  Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise.  But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account.  Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting *the particular person stopped* of criminal activity." (*Id.* at pp. 417-418, italics added; see *United States v. Arvizu* (2002) 534 U.S. 266, 273 (*Arvizu*) ["'stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity'"].)  We emphasize this "whole picture" must provide articulable and objective grounds to suspect the person of *criminal activity*, not simply of belonging to a certain group; without more, it is not a crime to associate with a criminal street gang.

"The touchstone of analyzing a detention, or for that matter any Fourth Amendment issue, is reasonableness." (*People v. Foranyic* (1998) 64 Cal.App.4th 186, 188.)  "The guiding principle, as in all issues arising under the Fourth Amendment and under the California Constitution [citations], is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' [Citation.]" (*In re Tony C.* (1978) 21 Cal.3d 888, 892.)  That standard is of particular importance when considering the concept of "'reasonable suspicion,'" which governs

8

detentions, because that term "does not lend itself to ready definition." (*Foranyic,* at pp. 188-189)  Indeed, "[t]he concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' [Citation.]" (*United States v. Sokolow* (1989) 490 U.S. 1, 7 (*Sokolow*).)

Even so, it is well-established "the Fourth Amendment requires '"some minimal level of objective justification"'" for a detention. (*INS v. Delgado* (1984) 466 U.S. 210, 229.)  "Although an officer's reliance on a mere 'hunch' is insufficient to justify a [detention] [citation], the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard [citation]." (*Arvizu, supra*, 534 U.S. at p. 274.)

Thus, a reasonable suspicion justifying a detention is "simply . . . 'a particularized and objective basis' for suspecting the person stopped of criminal activity." (*Ornelas v. United States* (1996) 517 U.S. 690, 696.)  So long as the facts known to the officer reasonably cause him or her to suspect the person he or she intends to detain might be or has been involved in criminal activity, the detention is lawful.  (*United States v. Place* (1983) 462 U.S. 696, 702; see *United States v. Hensley* (1985) 469 U.S. 221, 227-228 [analysis same if suspicion involves past, as opposed to present or future, criminal activity].)

"To legally detain an individual because of 'suspicious circumstances,' the prosecution must establish on the record that at the moment of the detention, there were specific and articulable facts, which reasonably caused officers to believe that (1) some activity out of the ordinary had taken place or was occurring or about to occur; (2) the activity was related to crime; and (3) the individual under suspicion was connected to the activity.  [Citation.]" (*People v. Bower* (1979) 24 Cal.3d 638, 644, superseded by statute on other grounds as stated in *People v. Lloyd* (1992) 4 Cal.App.4th 724, 733.)  Here, the prosecution failed to meet its burden.

9

The prosecutor asked Garcia whether, when he saw defendant coming towards him, he suspected defendant might "be involved in criminal activity past, present, or taking place at that time." Garcia answered he did, based on "[e]ither gang activity or drug sales because of the complaints we had received." He provided no other specifics, including nothing pointing to defendant.

Asked how recent these "complaints" were, Garcia replied, "Constantly, within days, weeks, months." Again, he did not articulate any specific "complaint" of criminal activity involving or connected to defendant individually, even though he recognized defendant as he approached.

On appeal, the People's sole justification for defendant's initial detention is based on his flight from officers at one end of the "high-crime area" alleyway towards Garcia and Quidort at the other end. Relying on *Wardlow,* the People argue defendant's "unprovoked headlong flight" in a high crime area upon seeing police provides legal cause for an investigatory detention. We are not persuaded.

In *Wardlow,* uniformed police officers were driving in a four-car caravan of police cars converging on an area known for heavy narcotics trafficking in order to investigate drug transactions. "The officers were traveling together because they expected to find a crowd of people in the area, including lookouts and customers." (*Wardlow, supra*, 528 U.S. at p. 121.) As they passed one location, one of the officers saw the defendant standing next to a building, holding an opaque bag. The defendant looked in the direction of the officers and fled. The officers turned their car around and watched the defendant as he ran through a gangway and an alley. Eventually they cornered him on the street and he was detained. During a patdown search, the officers found a gun in the bag the defendant was seen holding when the officers first drove up.

Assessing the situation from the officers' perspective, the totality of the circumstances—the bag, the high crime area, and the known heavy narcotics trafficking in that area—put the defendant's flight from the officers in an extremely suspicious light.

10

"It was in this context that [the officer] decided to investigate [the defendant] after observing him flee." (*Wardlow, supra,* 528 U.S. at p. 124.) Finding the detention lawful, the court noted "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." (*Ibid.*)

Nonetheless, the high court also has a long history of recognizing that innocent people may reasonably flee from police: "[I]t is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.' Innocent men sometimes hesitate to confront a jury; not necessarily because they fear that the jury will not protect them, but because they do not wish their names to appear in connection with criminal acts, are humiliated at being obliged to incur the popular odium of an arrest and trial, or because they do not wish to be put to the annoyance or expense of defending themselves." (*Alberty v. United States* (1896) 162 U.S. 499, 511; see also *Souza, supra,* 9 Cal.4th at p. 243 (conc. opn. of Mosk, J.) [noting the "unfortunate reality that some individuals in our society, often members of minority groups, improperly view the police more as sources of harassment than of protection. These individuals may innocently flee at the first sight of police in order to avoid an encounter that their experience has taught them might be troublesome"].)

Thus, the Supreme Court has never endorsed a per se rule that flight establishes reasonable suspicion to detain. Instead, flight is but one relevant factor in the reasonable suspicion analysis.

Similarly, in general "[a]n area's reputation for criminal activity is an appropriate consideration in assessing whether an investigative detention is reasonable under the Fourth Amendment." (*Souza, supra,* 9 Cal.4th at p. 240.) But "[a]n

11

individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[4] (*Wardlow, supra,* 528 U.S. at p. 124, see also *Brown v. Texas* (1979) 443 U.S. 47, 52 ["The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct"].) Hence, like flight, presence in a "high crime area" is probative, but not sufficient on its own to justify a detention. (See *People v. Casares* (2016) 62 Cal.4th 808, 838, overruled on another ground by *People v. Dalton* (2019) 7 Cal.5th 166, 263 ["reasonable suspicion cannot be based solely on factors unrelated to the defendant, such as criminal activity in the area"].)

In *Souza,* our Supreme Court explicitly rejected an argument flight alone was sufficient to justify a detention. (*Souza, supra,* 9 Cal.4th at p. 239.) Rather, flight is probative "only in those instances in which there is other indication of criminality, such as evidence that the defendant fled from a crime scene or after being accused of a crime." (*Id.* at pp. 235-236.) "To put it succinctly," there must be "'flight plus.'" (*Id.* at p. 236; see *People v. Britton* (2001) 91 Cal.App.4th 1112, 1118 [more than simple unprovoked flight occurred; the officer testified "to what might be dubbed 'flight plus'"].)

One such "flight-plus" factor was recognized in *Souza* itself: "time of night" is a "pertinent factor in assessing the validity of a detention." (*Souza, supra*, 9 Cal.4th at p. 241.) "[T]he presence on the sidewalk at 3 a.m. of two people who appeared to be talking to the occupants of a car parked in total darkness in an area that [the officer] described as a 'high crime area,' coupled with the evasive conduct by the occupants and defendant's sudden flight when [the officer] directed his patrol car's spotlight toward the group, justified a brief, investigative detention." (*Id.* at p. 242.) Similarly, in *People v. Holloway* (1985) 176 Cal.App.3d 150, 155, cited with approval in *Souza*, the court

---

[4]  "'[I]t may be fairly said that our entire nation is a high crime area,' particularly with respect to drug-related crimes." (*Souza,* at p. 241.)

upheld a detention based upon defendant's presence in a high crime area with four other men who were standing next to a car parked in a residential neighborhood. While acknowledging the defendant's right to be in such an area conversing with acquaintances, in *Holloway* the "social gathering" was at 3:00 a.m. (*Holloway,* at p. 155.)

Here, in contrast, the suspected LTK group was gathering in their own neighborhood at 1:00 p.m. on a Thursday, and Garcia had testified the citizen complaints of criminal and gang activity mostly came "over the weekend, at night."

Other "flight-plus" cases we have reviewed are similarly distinguishable, and the People have provided no authority directly on point. Instead, as they did below, they rely entirely on *Wardlow,* and argue that it holds that "flight" plus "high crime area" equals reasonable suspicion for a detention. This misconstrues *Wardlow,* because it did not make such a bright-line holding.

In *Wardlow,* the officers converged on an area of Chicago known for "heavy narcotics trafficking," not merely the ubiquitous "high crime area" in the present case. (*Wardlow, supra,* 528 U.S. at pp. 121, 124.) More importantly, the key difference between *Wardlow* and the present case is that when the defendant in *Wardlow,* was first seen, he was standing near a building and holding an opaque bag in this heavy narcotics trafficking area. Possession of a bag is a specific and articulable fact that can support a reasonable suspicion of a crime afoot. (See *People v. Lilienthal* (1978) 22 Cal.3d 891, 898-899 ["Reasonable grounds for believing a package contains contraband may be adequately afforded by the package's shape, design, and the manner in which it is carried"]; cf. *Henry v. United States* (1959) 361 U.S. 98, 104 [police must have reasonable grounds to believe a package contains contraband and its "shape and design might at times be adequate"].) In contrast, here defendant was not seen holding anything; his contraband was secreted in his sock.

Moreover, unlike the officers in *Wardlow*, here Quidort did not observe defendant flee after making eye contact with him; just the opposite. Quidort testified he

13

heard over his radio that "at least one of the subjects had started to run westbound from the alley." Defendant was never identified as this "subject."[5] Moreover, there is no evidence regarding what, if anything, defendant did before he fled from the alley. Thus, there is no evidence showing defendant fled "'at the first sight of a uniformed officer,'" as the People argue in their brief.

There is also nothing here to indicate whether the officers at the other end of the alley had ordered the "subjects" to remain where they were, or had communicated with them in any way. If not, defendant had no obligation to stay put simply because police had shown up. (*Florida v. Royer* (1983) 460 U.S. 491, 497-498; compare *United States v. Smith* (9th Cir. 2011) 633 F.3d 889, 891 [officer in a high crime area activated siren and lights, got out and ordered the defendant to stop, and "headlong run" ensued; detention lawful].)

Quidort saw defendant "making his way rather quickly westbound through one of the walkways between the apartment buildings." After making eye contact with Quidort, defendant slowed and walked directly towards the officers before getting within five to ten feet of them and being detained. Whatever else it may mean, "unprovoked headlong flight" is not a "brisk walk," or a "quick pace" *towards police officers*.[6]

Even characterizing defendant's behavior as "flight," this is not the "headlong flight" described in *Wardlow*. Moreover, although defendant's flight in a high crime area might be suggestive of wrongdoing, it did not corroborate any reliable or articulable suspicion of actual criminal behavior.

---

[5] Garcia testified he saw "people . . . running from the alley" toward him and Quidort, implying defendant was not the only one.

[6] We need not determine whether defendant's flight in this case was truly "unprovoked," when one of the purposes of the police activity that day was, in fact, to "provoke" such flight.

14

The trial court's conclusion "there was articulable suspicion to detain [defendant] and to see if he either had drugs on him or some kind of a weapon that can be used in an assault" is unsupported by any evidence that this specific person would be carrying either drugs or a weapon at the time of his detention. Indeed, the fact defendant was not patted down for weapons, handcuffed, or detained at gunpoint belies any notion the officers reasonably suspected defendant of having "a weapon" that could have been "used in an assault."

*Wardlow* fails to provide the People with the necessary support needed to justify defendant's initial seizure. Consequently, the People failed to meet their burden to show specific, articulable grounds to justify detaining defendant. As such, the evidence obtained from defendant immediately following his detention was unlawfully obtained and should have been suppressed. (*United States v. Crews* (1980) 445 U.S. 463, 470, 471 [exclusionary rule sanction applies to any "'fruits'" of a constitutional violation— "whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity," or "confessions or statements of the accused obtained during an illegal arrest and detention"].)

3. *Defendant's Subsequent Stationhouse Statements Were Tainted by Both His Unlawful Detention and the Unlawful Search of His Bedroom.*

Unlike a detention—a limited seizure justified merely by reasonable articulable suspicion of criminal activity—normally a search may only be justified by probable cause, whether with or without a warrant. "A warrantless search is unreasonable under the Fourth Amendment unless it is conducted pursuant to one of the few narrowly drawn exceptions to the constitutional requirement of a warrant." (*People v. Schmitz* (2012) 55 Cal.4th 909, 916.) Entry into a residence is a search under the Fourth Amendment. (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748 ["'physical entry of

15

the home is the chief evil against which the wording of the Fourth Amendment is directed'"].)

Here, officers entered defendant's residence and bedroom without a warrant, and the People offer no exception to the warrant requirement. The trial court found the entry was unlawful and suppressed the physical evidence found inside. The People do not challenge that ruling. The only question is whether defendant's subsequent statements to Topartzer at the stationhouse were tainted by the unlawful detention and the similarly unlawful search of his bedroom, and therefore should have been suppressed. The answer is obvious.

The People's citation to *New York v. Harris* (1990) 495 U.S. 14 (*Harris*) is unavailing. In that case, police entered a residence without a warrant or consent in order to make an arrest. (*Id.* at pp. 15-16.) While inside, no evidence was found, but the defendant made postarrest incriminating statements. (*Id.* at p. 16.) Significantly, the police in *Harris* had untainted probable cause to arrest the defendant *before* the unlawful entry, making the arrest—the defendant's seizure—lawful, despite the fact the entry into the residence—the search—was unlawful. Thus, "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*."[7] (*Harris,* at p. 21.)

Here, however, police did not have probable cause to arrest defendant until *after* he was unlawfully detained, drugs were found on his person, and he made incriminating statements. Put simply, defendant's arrest by Topartzer was illegal. Moreover, the warrantless search of defendant's room was made to find additional incriminating evidence, not to effectuate an otherwise lawful arrest.

---

[7] *Payton v. New York* (1980) 445 U.S. 573 (Fourth Amendment prohibits police from effecting warrantless and nonconsensual entry into suspect's home to make a felony arrest).

16

In *Brown v. Illinois* (1975) 422 U.S. 590 (*Brown*), the defendant approached the rear entrance to his apartment and saw, pointed at him through the window, a gun held by a stranger inside the apartment. The man said: "'Don't move, you are under arrest.'" Another man, also with a gun, came up behind the defendant and repeated that he was under arrest. The two men turned out to be Chicago police detectives. They had earlier broken into the defendant's apartment, searched it, and then arrested the defendant when he arrived, all without probable cause and without a warrant. They later testified they made the arrest for the purpose of questioning the defendant as part of a murder investigation. (*Id.* at p. 592.)

The issue in *Brown* was whether subsequent *Miranda* warnings purge the taint from statements obtained in violation of the Fourth Amendment. After holding they do not necessarily purge any taint, the high court further observed: "The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' [Citations.] The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which [the defendant's] arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." (*Brown, supra*, 422 U.S. at p. 605.)

While *Brown* involved an unlawful arrest, the high court's comments bear repeating in the context of the detention in this case. Here, police assembled around the alleyway as part of a "continuing investigation" into LTK, to "identify[] and contact[]" individuals regarding recent criminal activity, and to ascertain possible gang membership or association of those in the area. Moreover, unlike the police in *Brown,* here there was no specific crime they were investigating on this particular day and time. Instead, the

17

officers were flushing out their "usual suspects" in the same manner a hunter uses a dog to dash into the brush and force the gamebirds to take flight—literally.

Garcia stated defendant was singled out because "we focused on [him] as he was coming towards us and we were already detaining him." He was also "the closest one we could get." Garcia further stated his suspicion defendant was involved in their current investigation was based on "[t]he fact that he ran from an area where we know there's criminal activity taking place." But there was no evidence of then occurring criminal activity, let alone that defendant was himself involved.

Normally, the subjective intent of police officers is irrelevant in assessing cause to detain. (*Whren v. United States* (1996) 517 U.S. 806, 814.) Even so, "purpose is often relevant when suspicionless intrusions pursuant to a general scheme are at issue." (*City of Indianapolis v. Edmond* (2000) 531 U.S. 32, 47.)

Here, defendant's detention, "both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up." (*Brown, supra*, 422 U.S. at p. 605.) Like *Brown,* the manner in which defendant's detention was effected here gives the appearance of having been calculated "to cause surprise, fright, and confusion." (*Brown,* at p. 605.) And flight.

Indeed, from the outset, the plan here was to have police at both ends of the alleyway, make their presence known, and then flush out and detain anyone who ran. Defendant was caught and detained, not because of individualized suspicion of criminal activity, but by being "the closest one we could get."

We do not suggest that police may not use group detentions or encounters with suspected or known gang members in order to do in-field identifications, conduct

18

field interviews, take photographs, or serve gang "STEP notices."[8]  But these practices are intelligence and information gathering techniques, not a means to exploit Fourth Amendment violations for the purpose of obtaining evidence of crimes of which the police are otherwise unaware or unsuspecting.

Defendant's drugs and curb-side statements were obtained by exploiting his unlawful detention and should have been suppressed.  The entry and search of defendant's room was also unlawful, as the trial court found.  Perforce, defendant's *Mirandized* statements at the police station were obtained by exploiting both of the earlier Fourth Amendment violations and, as a result, they too should have been suppressed. (*Brown, supra*, 422 U.S. at pp. 603-604.)

---

[8]  A STEP notice "informs the recipient that he is associating with a known gang; that the gang engages in criminal activity; and that, if the recipient commits certain crimes with gang members, he may face increased penalties for his conduct.  The issuing officer records the date and time the notice is given, along with other identifying information like descriptions and tattoos, and the identification of the recipient's associates."  (*People v. Sanchez* (2016) 63 Cal.4th 665, 672; see Pen. Code, § 186.20 et seq. [California Street Terrorism Enforcement and Prevention Act].)

## DISPOSITION

Although the court suppressed a portion of the evidence obtained by the warrantless searches and seizures in this case, it should have suppressed it all. The judgment is reversed, and the case is remanded with directions to grant defendant's motion to suppress in its entirety.


THOMPSON, J.


WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.