Filed 1/26/22  P. v. Rouise CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NAKIA TERRELL ROUISE,<br><br>    Defendant and Appellant. | B312223<br><br>(Los Angeles County<br>Super. Ct. No. NA109605) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel J. Lowenthal, Judge.  Reversed and remanded with instructions.

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Defendant Nakia Terrell Rouise pleaded no contest to possession of a firearm with a prior violent conviction, possession of a firearm by a felon, giving false information to a peace officer, and driving a motor vehicle without a valid driver's license. The trial court sentenced Rouise to an aggregate prison term of three years eight months. Before Rouise pleaded no contest to these offenses, the court denied his motion to suppress the evidence forming the basis of the charge of possession of a firearm with a prior violent conviction.

On appeal of the judgment, Rouise challenges the trial court's denial of his suppression motion. At bottom, Rouise claims that police lacked reasonable suspicion to detain him in a business alcove late at night, and that the officers' subsequent discovery and seizure of the weapon giving rise to the charge of possession of a firearm with a prior violent conviction was the product of that illegal detention.

We conclude the People failed to discharge their burden of establishing that the warrantless investigative stop was justified by reasonable suspicion, that is, specific and articulable facts that Rouise may have been involved in criminal activity. At most, the People demonstrated that, at the moment Rouise was seized, the detaining officers were aware that Rouise had sought to avoid contact with the police late at night in a high crime area. Because we conclude the trial court erred in denying the motion to suppress, we reverse the judgment and remand for further proceedings.

**PROCEDURAL BACKGROUND**

On July 20, 2020, the People filed a second amended information charging Rouise with possession of a firearm with a

prior violent conviction, in violation of Penal Code[1] section 29900, subdivision (a)(1) (count 1); possession of a firearm by a felon, in violation of section 29800, subdivision (a)(1) (count 2); giving false information to a peace officer, in violation of Vehicle Code section 31 (count 3); and driving a motor vehicle without a valid driver's license, in violation of Vehicle Code section 12500, subdivision (a) (count 4).[2] The People also alleged certain sentencing enhancements that are not relevant to this appeal.

On October 19, 2020, Rouise moved to suppress the evidence forming the basis of count 1. The trial court held an evidentiary hearing on the motion on February 24, 2021. The court denied Rouise's suppression motion on March 24, 2021.

Later on March 24, 2021, Rouise pleaded no contest to counts 1, 2, 3, and 4 of the second amended information. The court sentenced Rouise to an aggregate prison term of three years eight months, which includes the upper term of three years on count 1 and a consecutive term of one-third of the mid-term of 24 months on count 2 (i.e., eight months). The court released Rouise from custody on the ground that the amount of his pre-imprisonment credits exceeded the sentence imposed. Rouise timely appealed the judgment.

---

[1] Undesignated statutory citations are to the Penal Code.

[2] The second amended information alleged that count 1 was perpetrated on a different date than when counts 2, 3, and 4 were purportedly committed.

## FACTUAL BACKGROUND[3]

We summarize only those facts that are pertinent to this appeal.

Shortly after midnight on July 1, 2018, Long Beach Police Officer David Kasowski was on patrol when he saw a car that had paper license plates. He turned on his lights and sirens to stop the vehicle.[4] The car continued driving and made two turns. The vehicle came to a stop at Lemon Avenue and East 17th Street. When the car stopped, two Black men exited from the passenger's side and fled north on Lemon Avenue.

Officer Kasowski observed that one of the two men who took flight was wearing a flannel shirt and had long dreadlocks. Officer Kasowski remained with the driver of the car, radioed for

---

[3] We derive the Factual Background primarily from the undisputed portions of the parties' appellate briefing that summarize the evidence considered by the trial court in ruling on the suppression motion. (See *Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 (*Artal*) [" '[B]riefs and argument . . . are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party. [Citations.]' [Citations.]"].)

[4] The Attorney General claims that Officer Kasowski had decided to stop the car for some unspecified traffic violation relating to the paper license plates. The Attorney General, however, fails to identify this alleged traffic violation. In any event, we fail to discern the relevance that the driver's alleged traffic violation has on the instant appeal, especially given that the Attorney General does not claim this unspecified violation supplied officers with reasonable suspicion to detain Rouise.

assistance, and reported that two Black men had fled, one of whom had dreadlocks.

Officer Jeffery Conrad heard the call regarding a vehicle that was refusing to yield, and that two Black men, one of whom had dreadlocks, had fled the vehicle and were running north along Lemon Avenue toward Pacific Coast Highway.[5] Officer Conrad reached the area within minutes. He stopped at a convenience store, but did not see anyone who matched the descriptions provided over the radio.

Officer Conrad continued driving east along Pacific Coast Highway, and saw a Black man, later identified as Rouise, round the corner at Lemon Avenue and " 'trot[ ]' " toward the police car. Rouise had something in his hand, which Officer Conrad later determined was clothing. Rouise, who did not have dreadlocks, "dove headfirst into a business alcove."

Officer Conrad stopped his vehicle just before the alcove. No one else was in the area. Officer Conrad told his partner, Officer Banuelos, what he had observed. One of the officers turned on a spotlight and pointed it toward Rouise. Rouise was

---

[5] In the respondent's brief, the Attorney General recites the facts included in the textual sentence accompanying this footnote. Because Rouise does not contest those facts in his reply, we consider them to be undisputed. (See *Reygoza v. Superior Court* (1991) 230 Cal.App.3d 514, 519 & fn. 4 [criminal case in which the Court of Appeal assumed that an assertion made by respondent was correct because "defendant did not dispute respondent's claim in his reply"]; *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].)

5

laying on his side with clothing under his head, and appeared to be pretending to be asleep.

Officer Banuelos exited the police car, drew his gun, and ordered Rouise to show his hands. Rouise rose to his feet and said, " 'For what? I didn't do shit.' " Officer Banuelos grabbed Rouise's shirt as Rouise tried to get away, and Rouise fell into the road. After a brief scuffle in which Rouise attempted to break free from the officers while he was on the ground, he was subdued and handcuffed.

Rouise was later carried into the back of a police car. About 15 minutes later, Officer Banuelos opened the car door, and he and Officer Conrad saw a blue revolver at Rouise's feet. The firearm was loaded with five rounds of ammunition. This blue revolver found in the police car is the weapon giving rise to the offense alleged in count 1—i.e., the charge of possession of a firearm with a prior violent conviction.

## DISCUSSION

### A. Applicable Law

"[W]hen defendants move to suppress evidence, they must set forth the factual and legal bases for the motion, but they satisfy that obligation, at least in the first instance, by making a prima facie showing that the police acted without a warrant. The prosecution then has the burden of proving some justification for the warrantless search or seizure, after which, defendants can respond by pointing out any inadequacies in that justification." (*People v. Williams* (1999) 20 Cal.4th 119, 136 (*Williams*).) " '[T]he controlling burden of proof at suppression hearings . . . [is] proof by a preponderance of the evidence.' [Citation.]"

(*People v. Flores* (2019) 38 Cal.App.5th 617, 626 (*Antonino Flores*)).)

" ' "An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review." ' [Citation.]" (*People v. Ayala* (2000) 23 Cal.4th 225, 255 (*Ayala*).)

Under the substantial evidence standard, the trial " 'court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences . . . .' " (See *People v. Reyes* (2009) 172 Cal.App.4th 671, 683.) This standard requires us to "accept all facts in favor of the ruling, including all reasonable inferences and deductions" from the evidence. (See *People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1227 (*Castaneda*).)

A warrantless temporary detention constitutes an unreasonable seizure violative of the Fourth Amendment to the federal constitution unless it is supported by "reasonable

suspicion." (See *Antonino Flores*, *supra*, 38 Cal.App.5th at pp. 626–628.) Reasonable suspicion exists if " 'at the moment of the detention, there were specific and articulable facts, which reasonably caused the officer to believe that (1) some activity out of the ordinary had taken place or was occurring or about to occur; (2) the activity was related to crime; and (3) the individual under suspicion was connected to the activity. [Citation.]' [Citation.]" (See *id.* at p. 628; see also *ibid.* ["So long as the facts known to the officer reasonably cause him or her to suspect the person he or she intends to detain might be or has been involved in criminal activity, the detention is lawful."].) A court applying the reasonable suspicion standard must assess " 'the totality of the circumstances' " of the detention. (See *id.* at p. 627.)

Officer Banuelos detained Rouise when the officer exited the police vehicle, drew his gun, and ordered Rouise to show his hands. (See *People v. Souza* (1994) 9 Cal.4th 224, 229 (*Souza*) ["A seizure occurs whenever a police officer 'by means of physical force or show of authority' restrains the liberty of a person to walk away."].) It is undisputed that the police did not have a warrant to detain Rouise. The burden thus shifts to the People to show that Rouise's detention was supported by reasonable suspicion. (See *Williams*, *supra*, 20 Cal.4th at p. 136; *Antonino Flores*, *supra*, 38 Cal.App.5th at p. 626.)

## B. The Trial Court Erred in Concluding the Police Reasonably Suspected Rouise Was Involved in Criminal Activity

In denying Rouise's suppression motion, the trial court declared: "The totality of the circumstances that the defendant matched the general description of a person who took off on foot from a car that was evading police, and was observed, at the time

8

and place of detention, close to where the car that was evading ultimately stopped; that there was no one else visible in the location in which the defendant was detained,[6] and that his conduct was not consistent with innocent activities, specifically running down an empty street in the middle of the night, and then diving into an alcove and pretending he was asleep.  [¶]  So the court particularized an objective basis for suspecting that he had been engaged in some kind of criminal activity, and formed a basis for reasonable suspicion to detain."

We find tenuous the trial court's conclusion that because Rouise was the only Black male found near the location of the traffic stop, Officer Conrad and Officer Banuelos reasonably suspected that Rouise was an occupant of the vehicle previously stopped by police.  "[A] number of courts have rejected the notion that reasonable suspicion for detaining someone may be based

---

**6** Upon asserting that "no one else [was] in the vicinity" of Rouise's detention and "[t]here were not even any other cars present," the Attorney General notes "the trial court was also able to view body camera footage from at least one of the arresting officers," and cites transcript excerpts showing that the trial court reviewed certain video clips.  The Attorney General does not describe this body camera footage, let alone provide us with a copy of it.  Accordingly, the Attorney General has not shown that this footage should have any impact on our review of the trial court's ruling.  (See *Pack v. Kings County Human Services Agency* (2001) 89 Cal.App.4th 821, 826, fn. 5 (*Pack*) [" 'Although it is the appellant's task to show error, there is a corresponding obligation on the part of the respondent to aid the appellate court in sustaining the judgment.  "[I]t is as much the duty of the respondent to assist the [appellate] court upon the appeal as it is to properly present a case in the first instance, in the court below."  [Citations.]'  [Citation.]"].)

upon vague or general descriptions"—e.g., race and sex.  (See *People v. Walker* (2012) 210 Cal.App.4th 1372, 1388–1389.)

Assuming arguendo the trial court's factual summary were accurate and that the officers reasonably suspected that Rouise was one of the two Black males who fled the car, these circumstances do not justify Rouise's temporary detention.

This description of the facts indicates the court found reasonable suspicion based solely on (a) Rouise's alleged flight from Officer Kasowski, and (b) Rouise's attempts to avoid contact with Officer Conrad and Officer Banuelos—i.e., diving into an alcove and pretending to be asleep.  The former does not give rise to reasonable suspicion of criminal activity because neither party suggests that Officer Kasowski "ordered [the two Black males exiting the vehicle] to remain where they were," and they "had no obligation to stay put simply because police had shown up."  (See *Antonino Flores*, *supra*, 38 Cal.App.5th at p. 632.)

Although our high court has held that "flight from police is a proper consideration—and indeed can be a key factor—in determining whether in a particular case the police have sufficient cause to detain," it has rejected the proposition that "flight alone, without other indicia of criminal activity, will justify an investigative stop by police."  (See *Souza*, *supra*, 9 Cal.4th at pp. 235–239.)  Indeed, the United States Supreme Court "has a long history of recognizing that innocent people may reasonably flee from police:  '[I]t is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses.' . . . [Citation.]"  (*Antonino Flores*, *supra*,

10

38 Cal.App.5th at pp. 629–630, quoting *Alberty v. United States* (1896) 162 U.S. 499, 511.)

Additionally, the Attorney General does not claim the police reasonably suspected the two fleeing Black males were accomplices to whatever Vehicle Code violations the driver had committed. In fact, Officer Kasowski admitted that when he stopped the car, the two fleeing individuals "had not committed any driving infractions or any other crime . . . ." Accordingly, the trial court's oral ruling does not establish " 'the detaining officers . . . ha[d the requisite] particularized and objective basis for suspecting *the particular person stopped* of criminal activity.' [Citations.]"[7] (See *Antonino Flores*, *supra*, 38 Cal.App.5th at p. 627.)

---

[7] By stating the police had "an objective basis for suspecting that [Rouise] had been engaged in *some kind of criminal activity*," the trial court intimated that reasonable suspicion of criminality generally (i.e., the detainee is connected with some as yet unspecified crime)—as opposed to reasonable suspicion of a particular type of offense (e.g., possession of a weapon or a traffic violation)—is a sufficient justification for a warrantless temporary detention. A leading treatise on Fourth Amendment jurisprudence has noted that "the Supreme Court has never expressly ruled on this question, and the lower courts are divided on the issue." (See 4 LaFave, Search and Seizure (6th ed. 2020) § 9.5(c).) Because the party charged with justifying Rouise's warrantless detention (i.e., the Attorney General) does not address this question, we need not discuss it further. (See *Williams*, *supra*, 20 Cal.4th at p. 136 [holding that the prosecution has the burden of showing a warrantless search or seizure was justified]; *Ayala*, *supra*, 23 Cal.4th at p. 255 [noting that the trial court's interpretation and application of the law is subject to de novo review]; see also *Pack*, *supra*, 89 Cal.App.4th

11

## C. The Attorney General Fails to Demonstrate that Rouise's Detention Was Nonetheless Justified

The Attorney General raises several arguments to salvage the trial court's ruling. First, the Attorney General contends that "the officers knew that [Rouise] was carrying something in his hand which, among other things, turned out to be an incriminating traffic vest." Even if the detaining officers initially suspected that Rouise had a weapon or contraband in his hand, Officer Conrad's testimony demonstrates that suspicion was dispelled when he and Officer Banuelos "stopped slightly before" the alcove and Officer Conrad realized Rouise had actually been carrying clothing. Furthermore, the Attorney General's contention that the clothing "turned out to be an incriminating traffic vest" is predicated on the Attorney General's assertions that Rouise had been carrying "a bright orange traffic vest" and "Officer Conrad was made aware of an additional description of a man with an orange vest running through a backyard in the neighborhood from a 911 caller . . . ." Yet, as the Attorney General admits, Officer Conrad "was uncertain whether he heard [the report from the 911 caller] prior to, or after, [Rouise's] detention." The Attorney General has thus failed to direct us to substantial evidence that at the time Rouise was seized, the detaining officers reasonably suspected that Rouise may have committed a trespass in a backyard. (See *Castaneda, supra,* 35 Cal.App.4th at p. 1227 [noting that the substantial evidence standard requires us to accept "all *reasonable* inferences and deductions" from the evidence, italics added].) Accordingly, the

---

at p. 826, fn. 5 [explaining that the respondent has a duty to aid the appellate court in affirming the judgment].)

supposed incriminating nature of the clothing in Rouise's hand cannot justify his detention.  (See *Antonino Flores*, *supra*, 38 Cal.App.5th at p. 628 [holding that reasonable suspicion supporting a warrantless detention must exist " 'at the moment of the detention' "].)

In the respondent brief's factual summary, the Attorney General asserts that after the two Black males fled from the vehicle stopped by Officer Kasowski, "[t]he driver of the car . . . advised Officer Kasowski that he did not stop because he thought the two Black male subjects were armed, and they told him not to stop."  Yet, the prosecutor conceded during the proceedings below that this fact is not pertinent to our analysis because when Rouise was detained, that is, when Officer Banuelos exited the police car, drew his gun, and told Rouise to show his hands, Officer Conrad and Officer Banuelos were not aware of the driver's assertions.  (See *Antonino Flores*, *supra*, 38 Cal.App.5th at p. 627 [" 'Based upon th[e] whole picture *the detaining officers* must have a particularized and objective basis for suspecting *the particular person stopped* of criminal activity,' " first italics added]; *Artal*, *supra*, 111 Cal.App.4th at p. 275, fn. 2 [holding that a party's arguments may be deemed admissions against that party].)

The Attorney General further claims that Rouise's evasive behavior—i.e., " 'running down an empty street in the middle of the night[ ] and . . . diving into an alcove and pretending he was asleep' "—"was suspicious and . . . inconsistent with someone engaged in innocent activity."  As we explained in Discussion, part B, *ante*, our Supreme Court has held that although "flight from police is a proper consideration" in assessing the validity of a detention, "[n]o single fact—for instance, flight from

13

approaching police—can be indicative in *all* detention cases of involvement in criminal conduct." (See *Souza, supra,* 9 Cal.4th at pp. 235, 239.) Thus, Rouise's elusive conduct, standing alone, does not demonstrate his detention was proper.[8]

We also reject the Attorney General's assertion that *People v. Flores*,[9] establishes Rouise's evasive behavior justified his seizure. In *Marlon Flores*, Division Eight of this court upheld a trial court's denial of a motion to suppress a gun, drugs, and drug paraphernalia that were discovered by officers after they had detained the defendant. (See *Marlon Flores*, at pp. 981–982, review granted.) Two officers encountered the defendant "at 10:00 p.m. at night on a cul-de-sac known for its illegal drug and gang activity . . . ." (See *id.* at pp. 982, 986, review granted.) When the defendant saw the officers, he "duck[ed] behind a car," and as "an officer approache[d] to see what [was] going on, the [defendant] remain[ed] crouched, with his hands out of sight and with his moving arms away from the approaching officer and his bright flashlight . . . ." (See *id.* at p. 986, review granted.)

---

[8] Similarly, we find unpersuasive the Attorney General's assertion that Rouise's " 'dive' into the alcove" late at night placed "the officers at a tactical disadvantage" warranting his detention because he was in "a position of cover." In particular, the Attorney General does not explain how the officers supposedly remained at any such tactical disadvantage when, upon moving closer to the alcove, they were able to observe that Rouise was on the ground, apparently pretending to be asleep—i.e., he no longer seemed to be in "a position of cover" vis-à-vis the officers.

[9] Our Supreme Court has granted a petition for review of this decision. (See *People v. Flores* (2021) 60 Cal.App.5th 978 (*Marlon Flores*), review granted Apr. 21, 2021, S267522).

14

"Despite the approaching light and noise [from the officer's radio], the man continue[d] to face away from it, to move his arms, and to keep his hands out of the officer's view." (*Marlon Flores*, *supra*, 60 Cal.App.5th at p. 986, review granted.)  The officers thereafter "ordered [the defendant] to stand and put his hands on his head[,] [and they] handcuffed [the defendant] out of concern for their safety"; "[o]ne officer [subsequently] checked [the defendant] for weapons."  (See *id.* at pp. 982, 986, review granted.)  The defendant thereafter confirmed that the car he ducked behind belonged to him.  (See *id.* at p. 982, review granted.)  In the car, officers found a loaded and unlicensed gun, a bindle of what appeared to be methamphetamine, and a methamphetamine bong.  (See *ibid.*)

In this case, although Officer Banuelos ordered Rouise to show his hands, there is no indication that Rouise was moving his limbs at all when the officers decided to detain him.  Rather, Officer Conrad testified Rouise was "laying on his side with clothing under his head, pretending to be asleep" just before Officer Banuelos detained Rouise.  Thus, unlike the officers in *Marlon Flores*, the detaining officers in the instant matter could not "point to specific articulable facts" giving rise to reasonable suspicion that at the moment they detained Rouise, he may have been drawing a concealed weapon and/or preparing to fire it at them.  (See *Antonino Flores*, *supra*, 38 Cal.App.5th at p. 627 ["An investigative detention is legally justified 'when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' [Citation.]"]; *Marlon Flores*, *supra*, 60 Cal.App.5th at p. 989, review granted [noting that the

15

defendant's "moving his hands . . . . out of the sight of the approaching officer" supported the trial court's finding of reasonable suspicion].)

We express no opinion as to the correctness of the *Marlon Flores* decision because it is distinguishable from our case. We do note that one of the justices on the panel dissented. (See *Marlon Flores*, *supra*, 60 Cal.App.5th at pp. 990–994 (dis. opn. of Stratton, J.), review granted.) In that dissent, Justice Stratton wrote: "The majority's overbroad view of what sort of conduct can be deemed suggestive of wrongdoing ignores applicable law and the realities of 21st century America. In the case of a person wary of police interaction, the majority's approach leaves virtually no room for that person's conduct to be deemed 'normal' and hence not suspicious." (See *Marlon Flores*, at p. 990, review granted.) Justice Stratton further opined that "[t]he majority's decision . . . threatens to subject people to [investigative] stops for commonplace conduct." (See *id.* at p. 993, review granted.)

The Attorney General also identifies two offenses that supposedly warranted the investigative stop: (1) "the officers were entitled to stop [Rouise] and detain him for an investigation of 'Pedestrian on roadway' in violation of Vehicle Code section 21956, subdivision (a)"; and (2) "the officers would have been entitled to investigate [Rouise's] presence in the alcove, particularly given the late hour and considering that he appeared to have dove into it without any apparent business there, to prevent a burglary."[10]

---

[10] The Attorney General tacitly acknowledges the trial court did not rely upon either justification when it denied Rouise's suppression motion.

Regarding the first offense, the parties disagree on whether there was substantial evidence that "Officer Conrad saw a Black man round the corner at Lemon Avenue, coming westbound on the south side of Pacific Coast Highway *in the middle of the street* directly towards the police car." (Italics added.) We need not resolve this factual dispute because regardless of whether the Attorney General has identified correctly Rouise's location when the detaining officers first sighted him, the Attorney General has not directed us to any evidence showing Rouise was "walk[ing] upon [a] roadway outside of a business or residence district" such that Vehicle Code section 21956, subdivision (a) was applicable.[11] In fact, Officer Conrad's testimony suggests that the portion of the Pacific Coast Highway in which Rouise was trotting may have been in a "business . . . district" (see Veh. Code, § 21956, subd. (a)), given the officer acknowledged that "there [are] businesses on that side of" the highway. Further, the Attorney General does not argue that Rouise's supposed presence in the middle of the roadway gave rise to reasonable suspicion that he perpetrated any other offense.[12]

The Attorney General's contention that "the officers would have been entitled to investigate" a potential burglary fares no better. The trial court found, and Officer Conrad's testimony indicates, that Rouise "d[ove] into an alcove and pretend[ed] he

---

[11] Vehicle Code section 21956, subdivision (a) provides: "No pedestrian may walk upon any roadway outside of a business or residence district otherwise than close to his or her left-hand edge of the roadway."

[12] We also note the fact that Rouise dove into the alcove after Officer Conrad first saw him had eliminated any risk of collision that Rouise initially posed to the officers.

17

was asleep." Although this behavior evidences Rouise's desire to avoid contact with the officers, it does not suggest he was about to enter a structure proximate to the alcove. (See § 459 ["Every person who enters any . . . building . . . with intent to commit grand or petit larceny or any felony is guilty of burglary."].) While the Fourth Amendment permitted Officer Conrad and Officer Banuelos to investigate Rouise's presence in the alcove by approaching him and " 'asking . . . if he [was] willing to answer some questions,' " (see *People v. Hughes* (2002) 27 Cal.4th 287, 328), they could not detain him in the absence of "specific articulable facts that . . . provide some objective manifestation that [he] may [have] be[en] involved in criminal activity." (See *Souza, supra,* 9 Cal.4th at p. 231.)

Additionally, the Attorney General argues that "the officers knew that this was a high-crime area and that there had been two shootings, one of them a murder, within the last two days in that specific area," and that they encountered Rouise late at night. Officer Conrad did testify that on June 28, 2018, a homicide occurred "in th[e] particular area" in which Rouise was detained, and that there was another "shooting in that same area" on June 30, 2018.[13] Furthermore, we acknowledge that "[t]ime, locality, lighting conditions, and an area's reputation for criminal activity . . . may or may not suggest to a trained officer

---

[13] In the record excerpt cited by the Attorney General in connection with this argument, Officer Conrad did not describe the location of Rouise's detention as a "high-crime area . . . ." Thus, it seems the Attorney General's characterization of this area is based on Officer Conrad's testimony that two shootings had occurred in the vicinity in the days preceding Rouise's seizure.

that [a] fleeing person is involved in criminal activity." (See *Souza*, *supra*, 9 Cal.4th at p. 239.)

Entirely absent from the Attorney General's analysis, however, are " 'specific and articulable facts, which reasonably caused the officer[s] to believe that . . . [Rouise] *was connected to the [criminal] activity*' " Officer Conrad had identified—i.e., the shootings that had occurred in that area. (See *Antonino Flores*, *supra*, 38 Cal.App.5th at p. 628, italics omitted.) It follows that the Attorney General has not shown these circumstances supplied the detaining officers with reasonable suspicion to stop Rouise. Were we to hold otherwise, officers could detain any person who was in that area at a late hour and had exercised his or her right to avoid having an interaction with the police. (See *Souza*, *supra*, 9 Cal.4th at p. 241 [" '[I]t may be fairly said that our entire nation is a high crime area[.]' "]; *Antonino Flores*, at p. 630 ["[L]ike flight, presence in a 'high crime area' is probative, but not sufficient on its own to justify a detention."].)

Lastly, the Attorney General claims "the trial court correctly observed that the detention was not prolonged, because it was [Rouise] himself who caused it to persist by not complying, by attempting to run from the officers, and then fighting with them in violation of section 148, subdivision (a)(1)."[14] Rouise clarifies in his reply brief that he "does not dispute this finding, or otherwise challenge the length of the detention," and that he

---

[14] Section 148, subdivision (a)(1) bars any person from "willfully resist[ing], delay[ing], or obstruct[ing] any public officer[ or] peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . ." (See § 148, subd. (a)(1).)

instead maintains that "the initial detention was [not] supported by reasonable suspicion."

In sum, the Attorney General has failed to demonstrate that Rouise's warrantless seizure comported with the Fourth Amendment. "[T]he Supreme Court [has] developed an 'exclusionary rule,' which generally prohibits evidence obtained in violation of the Fourth Amendment from being used in criminal trials.' [Citations.]" (*People v. Marquez* (2019) 31 Cal.App.5th 402, 411.) The Attorney General does not argue that any exception to that general rule applies. We thus conclude that the trial court should have granted the suppression motion and excluded the firearm seized by the officers that formed the basis of count 1. (See *Pack*, *supra*, 89 Cal.App.4th at p. 826, fn. 5.)

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to vacate its order denying defendant Nakia Terrell Rouise's suppression motion, enter a new order granting the motion, and conduct further proceedings consistent with this opinion.

NOT TO BE PUBLISHED.

BENDIX, Acting P. J.

We concur:

CHANEY, J.                    CRANDALL, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.