Filed 12/10/20 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Edgerrin J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> EDGERRIN J., <br><br> Defendant and Appellant. | D076461 <br> (Super. Ct. No. J239465) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> NO CHANGE IN JUDGMENT |
| In re Jamar D., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JAMAR D., <br><br> Defendant and Appellant. | D076462 <br> (Super. Ct. No. J242137) |

THE COURT:

It is ordered that the opinion filed on November 20, 2020 be modified to delete the image on page 11 of the opinion and replace it with the following redacted image:



Respondent's petition for rehearing is denied.

There is no change in judgment.

HALLER, Acting P. J.

Copies to:  All parties

2

Filed 11/20/20 (unmodified opinion with modified photo)
CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Edgerrin J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> EDGERRIN J., <br><br> Defendant and Appellant. | D076461 <br><br><br> (Super. Ct. No. J239465) |
| In re Jamar D., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JAMAR D., <br><br> Defendant and Appellant. | D076462 <br><br><br> (Super. Ct. No. J242137) |

APPEAL from judgments of the Superior Court of San Diego County, Browder A. Willis, Judge. Reversed and remanded with directions.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant Edgerrin J.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant Jamar D.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers, Christopher P. Beesley, Robin Urbanski, and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

After receiving a citizen's tip that Black males in a Mercedes were "acting shady," four San Diego Police Department (SDPD) officers drove to the scene in two marked vehicles, activating emergency lights in one. Parking behind the Mercedes, the officers positioned themselves beside each of its four doors and asked the three teenagers inside for their names and identification. A records check later indicated that the driver was on probation subject to a Fourth Amendment waiver. The officers searched the vehicle and recovered a loaded firearm and sneakers linking the minors to a recent robbery.

The minors moved to suppress the evidence found in the car, claiming their initial detention was not supported by reasonable suspicion. Finding the encounter was consensual rather than a detention, the juvenile court denied the motions. Two of the minors pleaded guilty to a subset of the charges originally filed.

In this consolidated appeal,[1] two of the minors—Edgerrin J. and Jamar D.—challenge the denial of their suppression motions. They argue the

---

[1]    After both appeals were fully briefed, we consolidated on our own motion *People v. Edgerrin J.* (D076461) and *People v. Jamar D.* (D076462) for purposes of decision, as both appeals involve the same facts, challenge the same ruling, and raise similar issues. (See, e.g., *People v. Lieng* (2010) 190

2

juvenile court erred in finding the encounter consensual and claim the citizen's tip did not establish reasonable suspicion to detain them. We agree on both points. But there was conflicting evidence as to whether officers knew *other* facts that might furnish reasonable suspicion for the stop, or justify the detention and search pursuant to Edgerrin's active Fourth Amendment waiver. Because the rationale for its ruling made it unnecessary for the juvenile court to address these other issues, we reverse and remand for a new hearing to permit it to assess witness credibility and reach factual findings in the first instance.

FACTUAL AND PROCEDURAL BACKGROUND

1.     *Police contact and search*

On March 13, 2019, SDPD officer Jerrad Schnautz was on patrol with his partner Willis Short in the Encanto neighborhood of southeast San Diego. At around 6:00 p.m., the two were parked on Madera Street along with fellow officers Kyle Williams and Samuel Euler. As the four officers dealt with an unrelated issue, a driver approaching southbound on Madera stopped her car in the middle of the street and stepped out. She said she lived nearby, provided her address, and reported there were Black males in a parked black Mercedes on her street who were "acting shady." After receiving the tip, all four officers drove three blocks to the location in two separate police vehicles.

When they arrived, the officers found a legally parked black Mercedes with three young Black males inside. Williams and Euler parked directly behind the Mercedes, activating their vehicle's emergency lights; Schnautz and Short pulled up behind them but did not activate their lights. The four officers stepped out, walked over to the Mercedes, and positioned themselves at each door to prevent its three occupants from leaving.

_____

Cal.App.4th 1213, 1218.) Because only Edgerrin requested oral argument, consolidation did not affect the hearing.

When the officers asked the vehicle occupants for their names and information, Edgerrin (sitting in the driver's seat) initially gave a false name. Schnautz went back to his patrol vehicle to perform records checks on all three occupants. Upon learning Edgerrin's identity and confirming that he was on probation subject to a condition waiving his Fourth Amendment rights (Fourth waiver), officers searched the Mercedes and recovered a loaded firearm underneath the driver's seat, a pair of sneakers connected to a robbery, and a clear white canister containing marijuana. The minors were arrested.

2.    *Charges and Motions to Suppress*

The San Diego County District Attorney filed petitions under Welfare and Institutions Code section 602 accusing Edgerrin and Jamar of robbery (Pen. Code,[2] § 211), receiving stolen property (§ 496, subd. (a)), and various weapons-related charges along with associated enhancements. Edgerrin was additionally charged with providing false information to a police officer (§ 148.9, subd. (a), count 8). Defendants moved to suppress evidence obtained from the Mercedes. (Welf. & Inst. Code, § 700.1.)[3]

The People opposed the suppression motions, arguing in their briefs that officers discovered Edgerrin's Fourth waiver during "a consent [*sic*] encounter with the minors." Although Officer Williams activated his emergency lights in parking behind the Mercedes, the prosecution claimed this was done to "warn on-coming traffic of officers on foot," and all officers proceeded to the vehicle "on foot in a slow and calm walk." Alternatively, the People claimed that the officers had reasonable suspicion to detain the

---

[2]    Further undesignated statutory references are to the Penal Code.

[3]    Our record does not disclose the charges filed against the third minor, D.W., whose suppression motion was also considered at the same hearing.

4

minors based on the citizen's tip. They argued that Encanto was a neighborhood where "[g]ang violence and violent crime [are] a fact of life" causing residents "to be hyper-vigilant of suspicious, or shady, activity," and it was significant that the tipster "felt the conduct she saw rose to the level of needing to flag down and tell the police."

3.  *Hearing and Ruling*

The suppression motions were heard by Judge Willis. The People examined SDPD gang detective Amalia Sidhu and Officer Schnautz, and the court reviewed footage from Schnautz's bodyworn camera (BWC) depicting officers' encounter with the minors and the subsequent search. The principal factual dispute between the parties centered on what Schnautz and the other officers knew about Edgerrin at the time they approached the Mercedes. The prosecution relied on testimony by Sidhu and Schnautz suggesting the officers knew by then that Edgerrin was a Lincoln Park gang member in rival gang territory, driving a black Mercedes, and on probation with a Fourth waiver. Defense counsel vigorously challenged this account, questioning why such information was omitted from police reports and conflicted with the officers' behavior in the BWC footage.[4]

As noted, the prosecution identified two theories in its written opposition—either the encounter was consensual, or there was reasonable suspicion to detain based on the citizen tip. At the hearing, the prosecutor expanded on these theories. Relying on testimony that officers knew beforehand of Edgerrin's active Fourth waiver, he suggested it was a straightforward "Fourth waiver probation search." Alternatively, the prosecutor claimed there was reasonable suspicion to detain the minors based

---

[4]     To avoid repetition, the parties' competing accounts are detailed in the discussion.

5

on officers' awareness that Edgerrin was a gang member in rival gang territory around a gang holiday—"this is reasonable suspicion, pure and simple, even without the Fourth waiver, knowing who he is, knowing when it was, knowing where he was." "And then you layer into that, we have a civilian who lives in this neighborhood actively and affirmatively approaching gang unit officers . . . flagging them down, telling them that this is shady."

Edgerrin's counsel responded that the prosecution was using the ends to justify the means. Despite Sidhu's testimony about what she told patrol officers, neither of her reports disclosed what transpired before the stop, leaving the court with a "credibility issue." And the citizen tip that people were "acting shady" was too vague to create reasonable suspicion that criminal activity was afoot. Although officers could have stopped to ask a few questions, they instead "drove up in two separate cars, lights already on, up behind a Mercedes [whose] license plate they didn't check. They had no idea who was in that vehicle," as the BWC video seemed to confirm.

At that point, the juvenile court interjected, asking "Where was the stop? There was no stop in this circumstance." The court rejected counsel's assertion that a stop occurred when the officers pulled up, lights on, behind the Mercedes. Instead, the judge described what transpired as a proper "consensual encounter" following a citizen tip.

After hearing from remaining defense counsel, the court denied the suppression motions, finding that no detention had occurred. As it explained, the officers had a right to be at that location and check on the vehicle after receiving the citizen tip. The court reasoned that at each step, the officers' actions were lawful—their initial investigation was justified by the tip, their encounter with the minors remained consensual, and once they confirmed

6

that Edgerrin was subject to a Fourth waiver, they could legally search the vehicle.[5]

4.    *Subsequent Proceedings*

Jamar admitted to robbery (§ 211) and the associated gang and firearm enhancements charged in count 1, and all remaining charges were dismissed. He was adjudged a ward of the court and committed to Urban Camp, with his commitment stayed while he was placed on probation.  Edgerrin admitted to assault with a firearm (§ 245, subd. (a)(2)) and the associated gang enhancement charged in count 2, and the charges remaining against him were likewise dismissed.  The court committed Edgerrin to the Youthful Offender Unit Program, setting his maximum custody at 12 years, 4 months with a custodial program not exceeding 480 days.

DISCUSSION

Challenging the suppression ruling, defendants argue the juvenile court erred in concluding the officers were engaged in a consensual encounter when they activated their lights, parked behind the Mercedes, and surrounded the vehicle.  They claim this conduct instead amounted to a detention, for which the vague citizen tip did not provide reasonable suspicion.  The People respond that the court could reasonably find that no detention occurred.  And even otherwise, they suggest the officers had reasonable suspicion to detain the minors based on facts they knew at the time.

As we explain, there is no question a detention occurred.  We further agree with defendants that the bare citizen tip of "shady" behavior in this

---

[5]    As will be discussed, the judge focused on the fact that the officers made no excessive show of authority by drawing weapons or activating their sirens, and although they had activated their lights, officers acted as though the encounter was consensual.

case does not, without more, furnish reasonable suspicion. Nevertheless, we must remand for further proceedings to permit the juvenile court to consider whether the detention and subsequent search could *otherwise* be justified by facts officers might have known about Edgerrin prior to the stop. Specifically, there were conflicting accounts at the suppression hearing as to whether officers knew at the time they approached the Mercedes that Edgerrin was inside with an active Fourth waiver, and/or that he was a gang member in rival gang territory. The evidence on these matters is heavily contested, and competing inferences could be drawn. Because the juvenile court erroneously focused on whether the encounter was consensual, it had no occasion to make a factual finding as to what facts the officers knew in making the detention. Remand is therefore appropriate for the court to make such findings in the first instance.

1. *Standard of review*

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, including brief investigatory stops. (U.S. Const., 4th Amend.; *People v. Souza* (1994) 9 Cal.4th 224, 229 (*Souza*).) The appeals before us turn on whether a detention occurred and, if it did, whether it was lawful. These questions present mixed issues of law and fact. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 342.) In reviewing a suppression motion, the trial court is vested with the power to assess witness credibility, resolve evidentiary conflicts, weigh the evidence, and draw factual inferences; its findings are upheld on appeal so long as they are supported by substantial evidence. (*People v. Woods* (1999) 21 Cal.4th 668, 673−674.) However, we exercise our independent judgment in determining whether on these facts the challenged search or seizure complied with the Fourth Amendment. (*People v. Brown* (2015) 61 Cal.4th 968, 975 (*Brown*).)

2. *The minors were detained.*

8

"An officer may approach a person in a public place and ask if the person is willing to answer questions.  If the person voluntarily answers, those responses, and the officer's observations, are admissible in a criminal prosecution." (*Brown, supra,* 61 Cal.4th at p. 974.)  "Such consensual encounters present no constitutional concerns and do not require justification." (*Ibid.*)  "However, 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen,' the officer effects a seizure of that person, which must be justified under the Fourth Amendment to the United States Constitution." (*Ibid.*; quoting *Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16 (*Terry*).)  When an individual submits to a show of authority, " 'a seizure occurs if "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave," [Citation].' " (*Brendlin v. California* (2007) 551 U.S. 249, 255 (*Brendlin*); *Brown*, at p. 974.)

Here, we readily conclude the minors were detained.  Two marked police vehicles pulled up behind the legally parked Mercedes.  As Detective Sidhu explained, this practice is called "contact and cover" and is designed to let people know there is more than one police vehicle present.  The first of the vehicles to park behind the Mercedes activated its lights.  Though there is no bright-line rule that activating lights always constitutes a detention, the "Supreme Court has long recognized that activating sirens or flashing lights can amount to a show of authority." (*Brown, supra*, 61 Cal.4th at pp. 978, 980.)

Even if a stop did not occur with the officers' arrival on the scene, it plainly occurred immediately thereafter when four officers stepped out of their vehicles after parking and walked to each door of the sedan for the admitted purpose of preventing its occupants from leaving.  The minors were

9

directed to roll down their windows, hand over proof of identification, and provide their names, addresses, and birthdays. When Edgerrin asked if he could call his father, Officer Williams ordered him, "Stay off this phone. I don't want you to do any of that kind of stuff, okay?" Jamar spelled his name for officers and gave his date of birth, but when he could not provide proof of identification, Officer Short warned him, "don't lie to me" and stated the officers were "not gonna leave here until we find out" his real name. Under these facts, no reasonable person in defendants' position would feel free to leave. (*Brendlin, supra*, 551 U.S. at pp. 255, 257; see *Brown, supra*, 61 Cal.4th at pp. 977–980 [defendant was detained when deputy stopped behind his parked car and activated his lights].) Instead, a reasonable person in the minors' position "would have perceived [the officers'] actions as a show of authority, directed at [them] and requiring that [they] submit by remaining where [they] [were]." (*Brown*, at p. 978.)

The juvenile court found otherwise based on footage from Officer Schnautz's bodyworn camera. Having requested transmission of that exhibit (Cal. Rules of Court, rule 8.224(d)) and reviewed the video, we reach the opposite conclusion. While the officers seemed calm, courteous, and used a conversational tone with the minors, there is no question a detention occurred. Overt displays of authority, such as drawing a gun or barking out peremptory commands, are not essential for police officers to establish control and curtail an individual's ability to leave.

Specifically, the video shows a police vehicle with activated lights parked behind the Mercedes on a quiet, two-way residential street. Williams and Euler step out and walk toward the two front doors of the Mercedes as Schnautz pulls in behind. Schnautz parks behind Williams's vehicle, and he and Short immediately step out and walk toward the two rear doors of the

10

Mercedes.  Williams directs Edgerrin to roll down his windows and tells him they were there because people reported something shady was going on.  By then, Schnautz and Short reach the rear doors, and all four officers engage with its occupants.  This still frame from the video plainly reflects a show of authority and submission by the occupants inside:



Faced with this record, the People appropriately concede that the evidence supports "a reasonable conclusion that there was, in fact, a detention."  Indeed, that is the *only* reasonable conclusion.

3.      *Uncontested evidence does not furnish lawful justification for the stop.*

Because the encounter was not consensual, the officers required legal justification to detain the minors.  In their opposition brief below, the People maintained that the citizen tip, standing alone, furnished reasonable suspicion for a detention.  At the hearing the prosecutor shifted gears, arguing in closing that the tip furnished reasonable suspicion *in combination with* officers' prior knowledge that Edgerrin was a gang member present in rival gang territory around a gang holiday.  Separate and apart from these theories, the People argued for the first time at the suppression hearing that the officers knew beforehand that Edgerrin had an active Fourth waiver, making it "a straight-up Fourth waiver probation search."

11

On appeal defendants contend the citizen tip did not, standing alone, furnish reasonable suspicion. Nor, in their view, could the detention be justified on the basis of Edgerrin's probation status, as "the record leaves considerable ambiguity regarding whether the officer in fact knew about this status prior to the stop." The People respond that there was reasonable suspicion because the citizen report of "shady" activity by occupants of a black Mercedes *amplified* officers' preexisting knowledge that Edgerrin was a gang member driving a black Mercedes in rival gang territory. Moreover, the People further claim that officers knew from Detective Sidhu that Edgerrin was on probation with an active Fourth waiver.

Addressing these arguments in turn, we conclude the vague citizen tip of "shady" behavior did not, standing alone, furnish reasonable suspicion for a detention. As to whether there were additional facts known to the officers that could support the citizen tip—or whether officers knew of Edgerrin's active Fourth waiver at the time they initiated contact—the facts are heavily contested, and no credibility finding was made by the juvenile court. Accordingly, on the present record the detention and subsequent search cannot be justified on this potential alternative ground. It will be for the juvenile court on remand to make the necessary factual findings and determine whether the officers in fact had enough additional information to constitute reasonable suspicion.

a. *Legal Principles*

Although a brief investigatory detention need not be supported by probable cause, it must be based on reasonable suspicion that criminal activity is afoot—i.e., "specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*Souza, supra,* 9 Cal.4th at pp. 230−231; see *Navarette v. California* (2014) 572 U.S. 393, 396

12

(*Navarette*); *Terry, supra,* 392 U.S. at p. 22.)  The reasonable suspicion standard is objective in nature, "based on the facts and circumstances known to the officer but without regard to the officer's subjective state of mind." (*People v. Flores* (2019) 38 Cal.App.5th 617, 626.)  Mere rumor or hunch do not suffice.  (See *Brown, supra,* 61 Cal.4th at p. 981; *Navarette*, at p. 397; *Terry,* at p. 22; *In re Tony C.* (1978) 21 Cal.3d 888, 893.)  "[W]here a reasonable suspicion of criminal activity exists, 'the public rightfully expects a police officer to inquire into such circumstances "in the proper exercise of the officer's duties." ' " (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.)

Reasonable suspicion is, of course, unnecessary here if the officers knew that Edgerrin was inside the black Mercedes and subject to an active Fourth waiver at the time they approached the vehicle.  But such knowledge must exist at the time of the stop; after-acquired knowledge of a probation search condition cannot justify an otherwise unlawful detention or search. (See *In re Jaime P.* (2006) 40 Cal.4th 128, 133 (*Jaime P.*).)

b.  *The citizen tip, by itself, did not provide reasonable suspicion for a detention.*

In its opposition papers and at the suppression hearing, the prosecution relied on the citizen tip to argue in whole or in part that there was reasonable suspicion to detain the minors.  Defendants maintain that this tip, standing alone, did not suffice.  We agree with defendants.

"The 'reasonable suspicion' necessary to justify a stop 'is dependent upon both the content of information possessed by the police and its degree of reliability.' " (*Navarette, supra,* 572 U.S. at p. 397; *Brown, supra,* 61 Cal.4th at p. 981.)  Where officers rely on a citizen's tip, that tip must be " 'reliable in its assertion of illegality, not just in its tendency to identify a determinate person.' " (*People v. Dolly* (2007) 40 Cal.4th 458, 471 (*Dolly*).)  "A tip's reliability depends upon an assessment of 'the totality of the circumstances in

13

a given case.' " (*Id.* at p. 464.) "One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." (*Adams v. Williams* (1972) 407 U.S. 143, 147.) Both quantity and quality matter: "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." (*Alabama v. White* (1990) 496 U.S. 325, 330 (*White*).)

Case law offers useful guideposts on the reliability requirement for citizen tips. In *White, supra,* 496 U.S. 325, an anonymous tip that a woman would drive from a particular apartment building to a particular motel in a station wagon with a broken right taillight, transporting cocaine, was sufficiently reliable to create reasonable suspicion once officers corroborated the innocent details. (*Id.* at pp. 331–332.) A 911 caller's tip that she had been run off the highway was likewise sufficiently reliable in *Navarette* where the caller identified the make and model of the vehicle, recited the license plate number, made a contemporaneous report, and used the 911 emergency system. (*Navarette, supra,* 572 U.S. at pp. 399–400.) Similarly, in *Brown*, officers had reasonable suspicion for a detention based on a 911 call reporting a violent fight. (*Brown, supra,* 61 Cal.4th at pp. 982–983.) "[The] caller's eyewitness knowledge, contemporaneous reporting, use of the 911 system, and confirmation of his address"—in addition to his overhearing one of the people in the fight claim to have a loaded gun—"all provided additional indicia of reliability." (*Id.* at p. 982.) Finally in *Dolly, supra,* 40 Cal.4th 458, an anonymous tip by a 911 caller that "a light-skinned African-American male had 'just pulled a gun' on him and had mentioned a gang name" was

14

sufficiently reliable because the caller provided key details about the perpetrator that could be corroborated by police. (*Id.* at p. 462.)

In contrast to these cases, there was no reasonable suspicion to detain and frisk a minor in *Florida v. J.L.* (2000) 529 U.S. 266 (*J.L.*), where police received an anonymous telephone tip claiming a young Black male in a plaid shirt standing at a bus stop was carrying a firearm. The tipster did not explain how he knew this information or suggest any particular familiarity with the suspect, and the tip itself included no predictions of future behavior that could be corroborated to assess his credibility. (*Id.* at pp. 271–272.) The court rejected the state's contention that the tip was reliable because "there really was a young [B]lack male wearing a plaid shirt at the bus stop" as the tipster described—reasonable suspicion required "that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." (*Ibid.*)

Turning to our record, Officer Schnautz testified at the suppression hearing that he and his three colleagues were parked on the northbound side of Madera Street when, around 6:05 p.m., a female driver approaching them southbound stopped and flagged them down. The driver told officers that she lived on a street nearby, where a parked black Mercedes was occupied by Black males who were "acting shady." Although the tipster "didn't elaborate on what she meant" by "acting shady," officers decided to make contact with occupants of the vehicle. The BWC footage supports this account; after receiving the tip, the officers immediately drove a few blocks to the specified

15

street and approached the Mercedes.[6] As we explain, this report of "shady" behavior lacked the requisite indicia of reliability—particularly as to the assertion of illegality—to be used as the sole justification for the detention.

"[P]rivate citizens who report criminal activity generally have no bias or motive other than good citizenship, and therefore tend to be reliable." (*Brown, supra,* 61 Cal.4th at p. 982.) Tips are even more reliable where "officers had the opportunity to see the tipsters, observe them face-to-face and evaluate their credibility." (*People v. Coulombe* (2000) 86 Cal.App.4th 52, 58 (*Coulombe*).) The tipster in this case spoke to officers face-to-face and revealed her address, providing some means of tracking her down. (*Brown,* at p. 982.) Although not established by Schnautz's testimony, it seems plausible that she was speaking from personal knowledge as someone who had just witnessed something she believed was "shady" behavior. (*Id.* at p. 981; but see *J.L., supra,* 529 U.S. at pp. 271–272 [anonymous tip was insufficiently reliable where the informant "neither explained how he knew about the gun nor supplied any basis for believing he had information about [the defendant]"].)

Even so, a reliability problem arises from the *information* the tipster conveyed. Although she contacted police in person and left identifying information, her tip provided only a vague and highly subjective characterization of the behavior she saw. What is "shady" to one person may

---

[6]    The BWC footage shows the tipster's conversation with officers and the events that follow, albeit without audio. A woman emerges from her vehicle and approaches the officers. Schnautz talks to her for about 40 seconds. He then walks to his car, gestures as if to direct Officer Williams in the other police vehicle to lead the way, and drives several blocks to where Williams is parked directly behind the black Mercedes, lights flashing. Schnautz pulls in behind Williams's patrol car, parks, and immediately steps out. At this point the audio begins.

be unremarkable to another.  Standing alone, nothing the tipster said was "reliable in its assertion of illegality."  (*J.L., supra,* 529 U.S. at p. 272.)  Although officers confirmed the presence of Black males in a black Mercedes parked on the specified street, this could not cure the tip's central defect—the car was legally parked, and officers did not observe any indicia of criminal activity when they arrived.  On this record, the citizen's tip was insufficiently reliable *as to any illegal behavior* to provide a basis for a detention.   (*Id.* at pp. 271–272; see, e.g., *Coulombe, supra,* 86 Cal.App.4th at p. 57 [finding reasonable suspicion from contemporaneous in-person citizen reports that someone fitting defendant's description was carrying a firearm amongst a crowd of New Year's Eve revelers].)

In isolation, an allegation of "shady" behavior is far too vague to suggest criminal activity.  "Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.' "  (*Navarette, supra,* 572 U.S. at p. 401 [finding reasonable suspicion where conduct alleged by 911 caller suggested drunk driving].)  Just as a *Terry* stop may not rest on "bare-boned tips" about guns or narcotics (*J.L., supra,* 529 U.S. at p. 273), a detention cannot be based solely on a citizen tip that someone is acting "shady."  Even Schnautz struggled to define what "acting shady" meant, testifying it could convey anything from a person casing cars or looking to commit burglary to being "in the area for any unknown reasons."  As Edgerrin's counsel remarked at the suppression hearing, "shady" can mean any number of things, and does not necessarily suggest a crime is occurring.  It follows that a bare-bones tip of shady behavior conveys no more than a mere hunch of criminal activity, which does not suffice to justify a stop.  (*Brown, supra,* 61 Cal.4th at p. 981; *Navarette, supra,* 572 U.S. at p. 397.)

17

We pause here to clarify that, confronted with a tip that was insufficient to create reasonable suspicion, officers were nonetheless entitled to investigate further. As the juvenile court stated, they had a right to drive to the location after receiving the tip. Once there, they could have made additional observations before approaching or attempted a consensual encounter by asking if the minors were willing to answer a few questions. What they could not do, without more, was immediately detain the minors. Here, it was uncontroverted that officers conducted no additional investigation after receiving the tip. Accordingly, unless they possessed additional *prior* knowledge to justify the detention—an issue the parties strenuously dispute—their actions were unlawful.

    c.      *Basing reasonable suspicion on other contextual evidence would require a credibility assessment the juvenile court did not make.*

Contending there were additional factors at play, the People assert that Schnautz made the stop based on his knowledge that Edgerrin was a gang member in rival territory *combined* with the citizen tip. True enough, Schnautz testified on direct that he was helping Detective Sidhu with her surveillance on Edgerrin earlier that day and that she had informed him that Edgerrin was "a Lincoln Park gang member" present "in a rival set neighborhood." Schnautz further claimed to know beforehand that Edgerrin drove a black Mercedes *and* was on probation with an active Fourth waiver. Upon receiving the citizen tip, Schanutz claimed he suspected that Edgerrin was inside and "could be looking to commit some kind of act of violence against any rival set gang member."

Sidhu's testimony supported this version of events. She claimed on direct to know prior to the day of the stop that Edgerrin was on probation with a Fourth waiver. In surveilling Edgerrin that afternoon, she said she saw him in a black Mercedes bearing the same license plate as the car later

18

stopped. Sidhu testified that she relayed to Schnautz and other officers that Edgerrin was in a black Mercedes with an active Fourth waiver. She was unequivocal that officers knew Edgerrin's probation status *before* making the stop.

While these contextual facts would surely affect our "totality of circumstances" analysis for reasonable suspicion (or justify the search outright as a straightforward probation search), we cannot rely on them to affirm for the simple reason that they were heavily disputed, with no credibility finding made by the juvenile court. Defense counsel vigorously challenged what officers knew in making the stop. As we describe below, the court at times cut off this inquiry, and it did not ultimately make a credibility finding as to facts that were unnecessary to its (ultimately incorrect) decision that no detention occurred. "Thus, we do not have before us any express or implied findings of fact and determinations of credibility that might permit us to uphold the search on this theory." (*People v. Hoeninghaus* (2004) 120 Cal.App.4th 1180, 1198.)[7]

For example, defense counsel noted while cross-examining Detective Sidhu that her police reports on March 14 and 26 did not mention surveilling Edgerrin that afternoon or informing other officers about his Fourth waiver or the Mercedes. When Sidhu replied that she conveyed this information verbally to Schnautz and other officers over the radio, counsel for Edgerrin questioned why there was no such reference in the computer-aided dispatch (CAD) generated in this case. The court stopped this inquiry, finding it "far

---

[7] Edgerrin suggests the court made an implied finding that officers knew about his Fourth waiver only *after* making the stop. But we do not read the court's comment that the Fourth waiver "came up" in the midst of a consensual encounter to suggest any implied finding that the officers were unaware of Edgerrin's Fourth waiver (or other attendant circumstances) *before* they approached the Mercedes.

enough afield." Edgerrin's counsel eventually established that police reports are written in chronological order, and Sidhu's reports did not mention seeing Edgerrin in a black Mercedes earlier that day nor reference any records check performed on Edgerrin prior to the stop. The first mention of a records check in Sidhu's reports instead followed her description of the stop. Once more, the court sustained the prosecutor's relevancy objection, halting further inquiry.

Defense counsel likewise identified several discrepancies in Schnautz's account. Schnautz testified he had reviewed Officer Williams's arrest report and found it "accurate," but conceded it contained nothing "related to Edgerrin [J.] driving around a black Mercedes" prior to his detention. Schnautz likewise did not recall being informed at any point about a license plate number for a particular black Mercedes. Edgerrin's counsel then probed Schnautz's "initial . . . reasons for approaching the vehicle." As Schnautz conceded, the tipster had simply conveyed that "there [were] some guys in a black Mercedes that seemed shady." This prompted him and the three officers to drive directly to the location of the Mercedes, park, and step out of their vehicles to contact its occupants. Schnautz did not run the license plate before stepping out. He agreed he had no prior contact with Edgerrin before making the stop.

Next up, Jamar's attorney tried to pinpoint when Schnautz and Sidhu had been in contact with each other. She asked Schnautz, "[Sidhu] didn't relay any information to you on March 13 about Edgerrin [J.]; correct?" Schnautz did not respond, invoking privilege under Evidence Code section 1040.[8] After some discussion, the court permitted a "limited inquiry." The

_____

8    Evidence Code section 1040 protects "official information" acquired in confidence by a public employee during the course of his or her job, which

20

question was read back, and Schnautz answered "Yes."[9] Trying to clarify, counsel asked, "[a]t what point in time did you receive this information [from Sidhu]?"—but the court ended the inquiry, finding it irrelevant to whether the encounter was consensual. When counsel asked whether either of the police reports Schnautz reviewed (authored by Williams and Short) contained any information related to prior surveillance on Edgerrin, the court sustained the prosecutor's objection, stating the topic had been covered by Edgerrin's counsel. Schnautz did not recall anything in the police reports relating to officers' prior knowledge of Edgerrin's probation status, Fourth waiver, or gang affiliation.

During closing arguments, Edgerrin's counsel stated that there remained a "credibility issue" as to what transpired earlier that day, as officers' alleged surveillance on Edgerrin was not reflected in any of the police reports. He understandably relied on several apparent inconsistencies between the police testimony and the BWC footage to suggest that officers "had no idea who was in that vehicle" when they surrounded it. For instance,

---

includes all evidence gathered in ongoing criminal investigations. (*County of Orange v. Superior Court* (2000) 79 Cal.App.4th 759, 764.) Where the privilege is asserted in criminal proceedings, the court must consider the defendant's due process interests—the prosecution cannot commence criminal proceedings "and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense." (*United States v. Reynolds* (1953) 345 U.S. 1, 12.) If the privilege is invoked, the defendant must make a prima facie showing for disclosure, upon which the court examines the party claiming privilege in camera to determine whether it should be upheld. (*People v. Montgomery* (1988) 205 Cal.App.3d 1011, 1021; accord, *In re Marcos B.* (2013) 214 Cal.App.4th 299, 308 [defense counsel has the right to propose questions for the in camera hearing].)

[9]     Between the original question being framed in the negative, an evidentiary objection causing a lengthy gap, and a readback, there may be some ambiguity in what Schnautz meant in answering "Yes."

Schnautz stumbled over how to spell or pronounce Edgerrin's name and did not appear to know who he was. Not until he later ran a records check did Schnautz seem to realize that Edgerrin was on probation. Jamar's counsel joined these arguments, further questioning the prosecutor's claim that this was a straightforward probation search: "If it was so clear and simpl[e], then there would have been evidence of knowledge of this Fourth waiver prior to this hearing, prior to Detective Sidhu sitting there on the stand." Instead, prior communication about the Fourth waiver was not mentioned in reports prepared by Williams, Short, or Sidhu. Counsel maintained that there wasn't "any credible information that there was knowledge that Edgerrin [J.] was on probation with a Fourth waiver prior to the stop."

In summary, counsel for both Edgerrin and Jamar argued that Schnautz and Sidhu had made up a justification after the fact—nothing in the police reports or BWC footage suggested that officers were surveilling Edgerrin that day, knew he was in a black Mercedes, knew he was a gang member in rival gang territory, or knew his probation and Fourth waiver status before making the stop. The juvenile court did not entertain these credibility questions, cutting the defense inquiry short because it rejected at the threshold that a detention occurred.

"A detention may not be justified after the fact on a basis not relied on by the officer." (*People v. Bower* (1979) 24 Cal.3d 638, 647; see *Jaime P., supra,* 40 Cal.4th at p. 133 [otherwise unlawful search of minor subject to probation search condition could not be justified by post-search discovery of that condition].) Absent a factual finding as to what officers knew about Edgerrin at the time they first approached the Mercedes, we cannot determine whether additional contextual evidence either provides reasonable

22

suspicion for a detention, or justifies the search completely based on Edgerrin's Fourth waiver.[10]

    d.    *Remand is necessary.*

Because justification for the stop turns on credibility assessments that have yet to be made, remand is necessary. Following a hearing, the juvenile court must make necessary factual findings as to what the officers knew when they stopped the minors. (See *People v. Bowers* (2004) 117 Cal.App.4th 1261, 1273 (*Bowers*) [remanding for the trial court to consider additional theories justifying the search]; *People v. LeBlanc* (1997) 60 Cal.App.4th 157, 168 [same].)[11]

If the court determines that the officers *knew* Edgerrin had an active Fourth waiver prior to the detention, that ends the inquiry. (*Jaime P., supra,* 40 Cal.4th at p. 134.) Likewise, if officers knew *other* contextual facts—such

---

10    The only other evidence at the hearing concerned the neighborhood where the detention occurred. Schnautz described Encanto as a "high-crime area," with reports of drugs, prostitution, vehicular and residential burglaries, and stolen vehicles. While this may provide relevant context for the stop, "reasonable suspicion cannot be based solely on factors unrelated to the defendant, such as criminal activity in the area." (*People v. Casares* (2016) 62 Cal.4th 808, 838; see *People v. Walker* (2012) 210 Cal.App.4th 1372, 1391 ["the fact that the detainee happens to find himself or herself in a high-crime neighborhood is, of itself, insufficient to support a reasonable suspicion for a peace officer to stop that person"]; *Souza, supra,* 9 Cal.4th at p. 230 [" 'the detaining officers must have a particularized and objective basis for suspecting the *particular person* stopped of criminal activity' " (italics added)].)

11    At oral argument before this court Edgerrin and the People expressed different thoughts regarding the proper scope of proceedings on remand. We leave this issue to the experienced trial judge, who can consider the parties' positions and evaluate whether to hold an entirely new suppression hearing or instead conduct a more limited proceeding to make the necessary factual findings.

as Edgerrin's gang membership, his presence in rival gang territory, or his sighting in a black Mercedes hours before the stop—those facts might enhance the reliability of the citizen tip or, in their totality, create reasonable suspicion to justify the detention. If the court upholds the detention on one or both of these grounds, crediting the officers' accounts, it should deny the motions to suppress and reinstate the judgments. (*Bowers, supra,* 117 Cal.App.4th at p. 1273.) But if the court instead resolves the credibility questions in defendants' favor and finds the search *unlawful*, it should grant the motions to suppress and afford Edgerrin and Jamar an opportunity to withdraw their guilty pleas. (*People v. Ruggles* (1985) 39 Cal.3d 1, 13; *People v. Hill* (1974) 12 Cal.3d 731, 769.)[12]

---

[12] Our disposition eliminates the need to address Edgerrin's final argument, conceded by the People, that the juvenile court failed to calculate his predisposition custody credits pursuant to Welfare and Institutions Code section 726. If the court on remand again denies Edgerrin's suppression motion and reinstates the judgment, he will have the opportunity to seek correction of the judgment to properly reflect the predisposition custody credits accrued.

## DISPOSITION

The judgments in *People v. Edgerrin J.* (case No. J239465) and *People v. Jamar D.* (case No. J242137) are reversed, and the matters are remanded to the juvenile court with directions to vacate its order denying the motions to suppress and conduct a renewed suppression hearing, consistent with this opinion, to resolve credibility conflicts as to what the officers knew at the time they detained defendants.  If the court again denies the motions to suppress, it shall reinstate the judgments; but if it grants the motions, it shall afford defendants an opportunity to withdraw their guilty pleas.  (See *Bowers, supra,* 117 Cal.App.4th at p. 1274.)


DATO, J.

WE CONCUR:


HALLER, Acting P. J.


GUERRERO, J.


25

Dato, J., Concurring.

I take the somewhat unusual step of concurring in my own majority opinion to add a few personal observations.

Nearly a century ago Justice Benjamin Cardozo wrote: "The great tides and currents which engulf the rest of men do not turn aside in their course and pass the judges by." (Cardozo, The Nature of the Judicial Process (1921) p. 168.) Nor should they. As our broader cultural views on racial injustice evolve, courts and judges are compelled to acknowledge and confront the problem. (See, e.g., *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 31 (conc. opn. of Liu, J.) [citing "the troubling racial dynamics that have resulted in state-sanctioned violence, including lethal violence, against Black people throughout our history to this very day"]; *Utah v. Strieff* (2016) 136 S.Ct. 2056, 2070−2071 (dis. opn. of Sotomayor, J.) ["it is no secret that people of color are disproportionate victims of this type of scrutiny" in suspicionless stops]; *State v. Saintcalle* (Wash. 2013) 309 P.3d 326, 341 (*Saintcalle*) ["Racial inequalities permeate our criminal justice system and present important moral issues we all must grapple with."]; *Glossip v. Gross* (2015) 576 U.S. 863, 921 (dis. opn. of Breyer, J.) [contemplating how conscious and unconscious bias affect jury determinations of relative culpability in capital cases "despite their legal irrelevance"].)

Although he ultimately denied the suppression motion, Judge Willis presciently anticipated issues that would soon stir our national consciousness when he remarked, "Now, we could go into the social justice analysis of young [B]lack men in [B]lack communities being over-policed, directly or indirectly, and discuss all manner of circumstances." He declined to do so, however,

believing "the law hasn't reached that point as of yet." Speaking in May 20*19*, he could not have known what a difference a year would make.[1]

We have resolved this appeal without delving into complex issues of race and policing, but I submit that as judges we must remain mindful of the broader context in which this case arose. Three Black male teenagers sitting in a legally parked vehicle were detained by four police officers. The detention may have been based on nothing more than a tip from a woman—who appears to be White—that the teens were "acting shady." In situations like this, law enforcement officers must be sensitive to how implicit biases might influence what passersby perceive as a threat, just as judges must appreciate how officers on the receiving end of a vague, subjective tip might interpret the information they obtain.[2] (See, e.g., *Saintcelle, supra,* 309 P.3d at p. 335 ["we all live our lives with stereotypes that are ingrained and often unconscious, implicit biases that endure despite our best efforts to eliminate them"].) Similarly, racial dynamics can affect how officers' actions are perceived by someone in defendants' shoes. (See, e.g., *Commonwealth v. Warren* (Mass. 2016) 58 N.E.3d 333, 342 [Black males in Boston who flee police "might just as easily be motivated by the desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity"];

---

[1] Referencing recent events, Jamar argues that even "in this day and age, [B]lack males continue to be reported to police for innocuous conduct." He lays some of the blame on courts for justifying detentions "without more specific articulable facts."

[2] It is significant that recent legislation "to ameliorate bias-based injustice in the courtroom" will soon require all public-facing court staff in this state to complete implicit bias training. (Stats. 2020, ch. 418, §§ 1(b), 3 (Assem. Bill No. 242).) Effective January 1, 2021, an amended Rule of Court will likewise mandate anti-bias training for all judicial officers. (Cal. Rules of Court, rule 10.469(e), as amended by the Judicial Council on Sept. 25, 2020.)

*Jamison v. McClendon* (S.D. Miss., Aug. 4, 2020, No. 3:16-CV-595-CWR-LRA) __ F.Supp.3d __ [2020 WL 4497723, at *22] [decades after the 1960's, "Black male teens still report a 'fear of police and a serious concern for their personal safety and mortality in the presence of police officers' "].)

Ultimately, there are myriad ways in which racial perceptions and biases might surface in a given criminal case, as in everyday life. And while the police officers here never inquired further to find out what exactly the tipster saw that concerned her, our opinion appropriately emphasizes the perils of relying solely on this *type* of report as a basis to detain. To that end, the objective standard of reasonable suspicion, which has always required more than a mere hunch to justify a detention, remains a vital safeguard for protecting our important Fourth Amendment rights.

DATO, J.